Harold Eugene ROGERS, Petitioner,

v.

R. G. BRITTON and James
Mabry, Respondents.

No. PB–C–77–71.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

March 6, 1979.

George Howard, Jr., Pine Bluff, Ark., George Van Hook, El Dorado, Ark., James Meyerson and Nathaniel R. Jones, NAACP, New York City, for petitioner.

E. Alvin Schay, Deputy Atty. Gen., Jackson Jones, Asst. Atty. Gen., Little Rock, Ark., for respondents.

## OPINION

ARNOLD, District Judge.

On November 5, 1973, Harold Eugene Rogers, a black 17-year-old, was convicted of first-degree rape by a jury in the Circuit Court of Sebastian County, Arkansas, Fort Smith District. The victim was a 21-year-old white woman. Rogers was 16 when the crime was committed. The jury fixed his punishment at imprisonment for life without parole. The Supreme Court of Arkansas affirmed the conviction on direct appeal, *Rogers v. State*, 257 Ark. 144, 515 S.W.2d 79 (1974) (6–1 decision). The Supreme Court of the United States denied certiorari, 421 U.S. 930 (1975). Rogers is in the custody of the Arkansas Department of Correction, of which respondents are officials.

On March 14, 1977, Rogers filed with this court a pleading styled Motion to Vacate Sentence by Way of a Petition for a Writ of Habeas Corpus. This court's jurisdiction is invoked under 28 U.S.C. § 2254. Rogers claims that his confinement violates the Constitution of the United States on five grounds:

1. Systematic exclusion of blacks from the jury.
2. Bias of the trial judge.
3. Prejudicial admission of the testimony of a witness claiming to be the victim of another rape perpetrated by Rogers.
4. A denial of equal protection of the laws, in that white defendants in sub-stantially similar circumstances were not so severely punished.
5. Violation of the Eighth Amendment, as applied to the States by the Fourteenth, in that the sentence imposed, under all the circumstances of this case, was so disproportionate and excessive as to be cruel and unusual punishment.

The first three grounds go to the validity of the conviction itself, the last two to that of the sentence as such. Each of these points will be discussed in turn.

### I.  Jury Selection

A criminal defendant tried in a state court is entitled to an impartial jury under the Sixth Amendment as applicable to the states by virtue of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Rogers alleges that the jury-selection process denied him an impartial jury. He first argues that blacks were systematically excluded from the jury panel, and that his attorneys were unfairly limited in their attempts to question white prospective jurors about racial bias. It is true that six black prospective jurors were challenged peremptorily by the prosecution. An all-white jury resulted. But as the Supreme Court of Arkansas pointed out, five of the black prospective jurors were acquainted with Rogers or members of his family, and the sixth was reluctant to serve. The exercise of peremptory challenges, especially under these circumstances, does not constitute systematic exclusion (if indeed it ever does). *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *United States v. Thompson*, 518 F.2d 534 (8th Cir. 1975).

The trial court, moreover, allowed Rogers's counsel great latitude in conducting voir dire examination of white prospective jurors. Counsel were given the opportunity to question specifically about racial bias. Voir dire examination, most of it conducted by defense counsel, spanned 473 pages of transcript. Jurors were questioned about racial bias at length. The

judge limited examination only when he felt that the questioning exceeded the bounds of reasonableness. The latitude provided by the trial court easily met constitutional requirements. *Compare Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1975), *with Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). Rogers concedes that the trial court has broad discretion in this area, subject to the essential demands of fairness. See *Ham v. South Carolina, supra; United States v. Bear Runner,* 502 F.2d 908 (8th Cir. 1974); *Pope v. U. S.,* 372 F.2d 710 (8th Cir. 1972). Rogers was not denied fundamental fairness or an impartial jury.

## II. Claimed Bias of the Trial Judge

■ Rogers next argues that the trial judge exhibited bias, and that the reprimands he issued to Rogers's counsel in the jury's presence were unwarranted and prejudicial, thereby denying him an impartial and fair trial. After reviewing the record in the state trial court, this court is not convinced that the judge exhibited bias. As the Supreme Court of Arkansas observed, Rogers's argument that the judge was biased is based primarily upon statements he made outside the jury's presence, and even these statements are ambiguous and do not clearly show bias. Even assuming that the statements made indicated his personal feelings about the case, there is no showing that they affected any decisions the judge made, and no showing that bias was exhibited to the jury. Further, the judge gave an instruction that he had not intended to say or do anything to suggest what should be found as facts, or to intimate that he believed or disbelieved any witness.

■ The reprimand alleged to have been prejudicial arose during cross-examination of the prosecutrix by defense counsel. In an attempt to discredit her testimony, counsel asked a series of terse questions about how the prosecutrix reacted during the rape attack. While the witness was still on the stand, the following exchange occurred between the court and defense counsel:

Mrs. Miller (defense counsel): Your Honor, maybe the prosecutrix would like a few minutes.

Court: I beg your pardon?

Mrs. Miller: Maybe the prosecutrix would like a few minutes to get herself together.

Court: Well, you got her this way. Why don't you go ahead?

Mrs. Miller: Your Honor, the defense would like to point out that we're not intentionally attempting to get her this way, and we would like for her to have an opportunity to get herself together.

Court: I didn't know she appeared to be so distraught. Do you wish a recess?

A: No.

Court: I beg your pardon?

A. I can finish.

Defense counsel then moved for a mistrial arguing that the court's remark in the presence of the jury, "Well, you got her this way," was highly prejudicial and could not be corrected by a cautionary instruction. The motion was denied. The remark in and of itself did not deny Rogers a fair trial, even though it would have been better if the remark had not been made in the jury's presence. Any isolated remark must be evaluated in the context in which it is made. See *Walker v. Bishop,* 408 F.2d 1378 (8 Cir. 1969). Here, the remark appears to be an indication of irritation with the tactics of defense counsel rather than evidence of personal bias or prejudice. As such, it did not amount to a denial of a fair trial.

## III. Testimony of another Alleged Victim

■ Rogers's third ground for relief is that the admission of the testimony of Sonja Suter was prejudicial and highly inflammatory. Mrs. Suter testified that she was raped by Rogers the night following the attack on the prosecutrix. (Rogers had been tried for this rape, but the jury was unable to reach a verdict.) The prosecutrix in this case was unable to identify Rogers as her assailant. The circumstances of both attacks were strikingly similar, and the trial court ruled that the testimony was relevant on the issue of identity.

This Court is unable to conclude that this testimony unfairly prejudiced Rogers. The identity of the rapist was in issue. It had not been established conclusively. The rape of Mrs. Suter was closely related in time and nature to the rape of the prosecutrix. The testimony was offered to establish the identity of the prosecutrix's assailant, and was admissible. *United States v. Turquitt*, 557 F.2d 464 (5th Cir. 1977). It showed a distinctive modus operandi. The troubling consideration is whether its possible prejudicial impact outweighed its probative value. *United States v. Moody*, 530 F.2d 809 (8 Cir. 1977). Although prejudicial impact is not always totally erased by a cautionary instruction, here the jury was instructed that Mrs. Suter's testimony was admitted solely for the purpose of establishing identity and should be considered only for that purpose. On balance, its admission was not so inflammatory and prejudicial as to outweigh its clear relevance on the identity issue.

### IV. Racial Disparity in Sentencing

Rogers argues that white defendants similarly situated—first offense, no harm to the victim apart from the rape itself—are not being punished so severely. Rape of a white woman by a black man, he says, is commonly visited with the maximum penalty, even in the absence of aggravating circumstances. White rapists, or black rapists accused of assaulting black victims, are not so treated, he argues. From these asserted facts the court is asked to infer that the jury in this case was infected by racial motives, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Defendants argue first that this contention was never presented to the Supreme Court of Arkansas, or to any state court, and that therefore relief is barred here by failure to exhaust state remedies. The argument is without substance, but it is unnecessary to decide it one way or the other in this proceeding. This court finds that the proof simply fails to sustain Rogers's factual proposition. His major reliance, for example, is on the fact that in *McDonald v.*

*State*, 253 Ark. 812, 491 S.W.2d 36 (1973), a white defendant received a sentence of only 30 years (the minimum), although his circumstances were, it is said, similar to those in the instant case. In *McDonald*, however, the defendant did not kidnap his victim, as Rogers did, and he apparently did not plan in advance to use a weapon.

In addition, there are before the court extensive tabulations of sentences imposed on rape defendants in Arkansas. These tabulations were submitted in response to an order of the court entered on petitioner's motion. They fail to sustain petitioner's theory. The state's additional response filed December 22, 1978, lists 57 convicted rapists, of whom Rogers is one. Of these 57, eight were sentenced to life without parole. Of these eight, four were white and four black. It is possible, of course, that some white defendants whose conduct was just as reprehensible as petitioner's were not so harshly punished. It is possible that the comparative leniency shown them was racially motivated. But possibility is not the same as proof. The data furnished here are not proof. They do not even make enough of a case statistically to create an inference that would shift the burden to respondents. The system of jury sentencing without standards may lend itself to constitutionally impermissible motives, but that is another point, to which we now turn.

### V. Cruel and Unusual Punishment

The last ground urged upon the court is that life imprisonment without parole is, in the circumstances of this case, so grossly disproportionate and excessive a penalty as to be a cruel and unusual punishment, in violation of the Eighth Amendment, as applied to the states by the Due Process Clause of the Fourteenth. The circumstances urged are that Rogers was only 16 when he committed the crime, and 17 when sentenced; that he had no prior criminal record; that the victim was an adult woman who suffered no lasting physical or mental harm other than the rape itself; and that the jury was given no instructions or standards to guide its sentencing discretion.

Rogers argues, in addition, that the interracial nature of the offense and the inflamed condition of the community at the time warrant an especially strict scrutiny of the sentence.

Petitioner was convicted of rape in the first degree. The offense was defined by Section 1 of Act 362 of 1967, formerly codified as Ark.Stat.Ann. § 41–3401, as engaging in sexual intercourse with a female "(a) by forcible compulsion; or (b) who is incapable of consent by reason of being physically helpless, or mentally incapacitated or (c) who is less than eleven (11) years old." Rogers's conduct falls under subdivision (a). The offense was originally punishable by "death or thirty (30) years to life imprisonment in the State Penitentiary." Section 2 of Act 362 of 1967, formerly codified as Ark.Stat.Ann. § 41–3403. The death penalty for rape was repealed by Act 438 of 1973, the same statute that first specified aggravating and mitigating circumstances, bearing on the imposition of the death penalty for certain kinds of homicide.[1] Thus, when Rogers was tried the range of penalties available for his crime was 30 years to life.

In his case, life means life—no parole. Under Section 1(b)(1) of Act 48 of 1969, Ark.Stat.Ann. § 43–2807(b)(1). "Individuals sentenced to life imprisonment . . . after the effective date [February 12, 1969] of this Act, shall not be eligible for release on parole unless such sentence is commuted to a term of years by executive clemency. When such life sentence has been commuted to a term of years, the individual shall be eligible for release on parole after having served one third (⅓) of the time to which the life sentence was commuted, with credit for good time allowances." Had Rogers been given a term of years less than life, he would have been eligible for parole after serving one third of the sentence, less allowance for good time. A sentence of 75 years, for example, could have resulted in his release on parole after 25 years of im-

prisonment, at which point he would be only 42 years old.

A sentence to life imprisonment without parole may not literally be "life without hope," as Rogers argues, but it is close. He is an exile from life, forever excluded from its enjoyment. He may hope for clemency—either pardon or, far more likely, commutation—but the hope is a thin reed. Executive clemency is a matter of grace. It is a prerogative that need never be exercised, and the chance that it will be exercised in any given case cannot be measured. There is no right to parole, either, and life with the possibility of parole can turn out in practice to be literally imprisonment for life, but parole is a much less remote contingency than clemency. Parole is granted in most cases before the expiration of a full term of imprisonment. The death penalty is unique, but so is life without parole. It is the loss, not of life itself, but of all that makes life worth living.

Rogers was 16 when the offense was committed and 17 when he was tried. He had no prior criminal record. These facts make a powerful appeal to the conscience. There are no doubt some incorrigible 17-year-olds, but teen-agers are probably much less likely to be incorrigible than adults. The whole system of juvenile justice rests on that assumption, at any rate, and it is an assumption shared by the Arkansas General Assembly. By statute, offenders under the age of 18 are generally regarded as "delinquent children," Ark.Stat.Ann. § 45–204, and are proceeded against as such unless the court makes a judgment that they should be treated as adults. Ark.Stat.Ann. § 45–233 evinces a special concern for youthful offenders: "in cases of delinquency, . . . as far as practicable, any delinquent child shall be treated not as a criminal, but as misdirected and misguided and needing aid, encouragement and assistance." The purpose of the process of juve-

---

1. It is interesting to note, in addition, that the General Assembly further relaxed the penalty for rape in 1975. Section 1803 of Act 280 of that year, the Criminal Code, Ark.Stat.Ann. § 41–1803, defines rape (of which there are now no degrees) as "a class A felony," the penalty for which is "not less than five (5) years nor more than fifty (50) years, or life." Ark.Stat.Ann. § 41–901(1)(a).

nile justice is for the child to "be helped and educated and equipped for industrial efficiency and useful citizenship." *Ibid.* Even when young offenders are proceeded against as adults, they are to be segregated from older convicts, Ark.Stat.Ann. § 45–225. When sentenced to a term of years they are immediately eligible for parole, Ark.Stat.Ann. § 43–2807(c)(2), by contrast with older offenders, who must in general serve one-third of their sentence before becoming so eligible.

It is not only the defendant, of course, on whom the sentencing process focuses. The victim is also important. However much enlightened penology may discount retribution as a proper motive, we all have feelings of retribution within us, and those feelings grow stronger the greater the injuries of the victim. Rape is abhorrent to any civilized person, and everyone condemns those guilty of it. To the extent that this court understands the nature of the crime—and perhaps no man can fully comprehend it—, rape is probably more revolting, more heinous, than any crime except murder. But all rapes are not the same, and all victims of rape are not equally affected. If the victim is a child, if she is killed or mutilated, or if she is left with serious or permanent psychiatric injury, the penalty appropriate to the case may be much more severe than if those factors were not present. Here, although the defendant had a gun and forced the victim to accompany him at gunpoint, he did not resort to torture, aggravated battery, or other outrageously vile or inhuman conduct. There were no lasting injuries, physical or psychological, to the victim—or at least the state proved none at the trial. She was a grown woman, not a child or an adolescent. As noted in *Snider v. Peyton*, 356 F.2d 626, 627 (4th Cir. 1966), "[t]here is extreme variation in the degree of culpability of rapists," and this defendant's conduct appears to place him at the lower end of the scale of blameworthiness among those guilty of rape.

Rogers argues that all these circumstances make his punishment cruel and unusual in violation of the Eighth and Fourteenth Amendments, and the argument is enhanced by the lack of any standards to guide the jury in its sentencing discretion. This Court, however, is unable to decide the question in the present posture of this case, because it is not clear that state remedies have been exhausted. Ark.Stat.Ann. § 43–2310 provides as follows:

The Court shall have power, in all cases of conviction, to reduce the extent or duration of the punishment assessed by a jury, if, in the opinion of the court, the conviction is proper, and the punishment assessed is greater than, under the circumstances of the case, ought to be inflicted, so that the punishment be not, in any case, reduced below the limit prescribed by law in such cases.

After the jury verdict of life imprisonment in this case was returned, the Court asked counsel if they would waive the customary waiting period of 48 hours, and they agreed to do so. The Court then addressed the defendant personally (Tr. 947–49):

Mr. Rogers, you have heard the verdict of the jury, and it now becomes my duty, as you understand, to impose sentence in conformity with this judgment, this sentence you received here today.

Nothing else of any substance was said, apart from some discussion with counsel about a possible appeal. Not only did the Court not exercise its discretion under Section 43–2310 to consider a reduction of sentence. It appears to have believed that there was no such discretion.[2]

This situation is strikingly similar to that before the Supreme Court of the United States in *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970) (per curiam), a case that originated in this Court. The case was remanded for further consideration. The Court's opinion notes the existence of Section 43–2310 and goes on to say:

**2.** In addition, no right of allocution was accorded, as required by Ark.Stat.Ann. § 43–2303. Failure to accord this right can be reversible error on direct appeal, *Tate v. State*, 258 Ark.

135, 524 S.W.2d 624 (1975), and apparently there are circumstances under which it can be raised on collateral attack. *Coleman v. State*, 257 Ark. 538, 518 S.W.2d 487 (1975).

No effort was made by the petitioner to seek relief in the state courts under this statute. There is nothing in the record or otherwise reported to us to indicate that this remedy is not now available.

398 U.S. at 266–67 n. 3, 90 S.Ct. at 1581 n. 3.[3]

Here, as in *Maxwell*, there is no indication that petitioner ever sought to invoke Section 43–2310. That case, like this one, was a federal habeas corpus proceeding to review an Arkansas state-court conviction for rape. This Court has examined the opinions of the Supreme Court of Arkansas construing the statute, and the issue of its availability in a post-conviction proceeding appears never to have been decided. See *Collins v. State*, 261 Ark. 195, 548 S.W.2d 106 (1977); *Davis v. State*, 246 Ark. 838, 440 S.W.2d 244 (1969).

This Court declines to rule on petitioner's Eighth Amendment claim until his state remedies have been clearly exhausted. He should present to the Supreme Court of Arkansas a petition under Rule 37.2(a) for leave to seek post-conviction relief. The petition should argue Section 43–2310 and the absence of allocution. It should also (if the proceeding goes that far) ask the Supreme Court of Arkansas to exercise whatever power it has to review sentences. See *Collins v. State, supra.* The power of a federal court to set aside state-court judgments is a drastic remedy to be exercised only after the state courts have a fair opportunity to pass on all the issues. If the state courts reject petitioner's arguments, he may apply to this Court for further relief.

Rogers's conviction was valid, and his claims attacking it are dismissed with prejudice. His Eighth Amendment claim that his sentence was constitutionally excessive is not ruled on at this time. The case will be held in this Court pending the outcome of petitioner's application to the state courts.

---

**3.** On remand, this Court directed Maxwell to apply to the Supreme Court of Arkansas for leave to file a petition under Rule 1 (as it then was) for post-conviction relief. The Supreme Court denied leave to file, without stating its reasons. State remedies had then been exhausted, but the case was dismissed by this Court as moot after the Governor commuted Maxwell's death sentence to life imprisonment.